**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 25-11348

_____

In re: AE OPCO III, LLC.,

*Debtor.*

_____

AE OPCO III, LLC,
AE HOLDCO III, INC.,

*Plaintiffs-Appellees-Cross Appellants,*

*versus*

AAR CORP.,

*Defendant-Appellant-Cross Appellee.*

_____

Appeals from the United States Bankruptcy Court
for the Middle District of Florida
D.C. Docket No. 8:22-bk-01186-CPM

_____

Before NEWSOM, LAGOA, and KIDD, Circuit Judges.

NEWSOM, Circuit Judge:

This thorny bankruptcy cross-appeal defies easy introduction, but here goes:  Together, AE OpCo, the debtor, and AAR, one of its creditors, present several issues concerning the bankruptcy court's treatment of three of AAR's claims.[1]  The claims arise out of AE OpCo's rejection of a procurement contract with another bankruptcy creditor, Short Brothers.  That rejection potentially left AAR on the hook for aspects of AE OpCo's breach.  Accordingly, pursuant to a pre-bankruptcy agreement with AE OpCo, AAR filed the three claims relevant here: one for indemnification pegged to what AAR might owe Short Brothers pending resolution of their dispute in a suit overseas (we'll call it the "indemnification claim"), one for the attorneys' fees that AAR incurred while contesting Short Brothers's collection efforts (the "defense-costs claim"), and one for the attorneys' fees that AAR incurred in the bankruptcy proceeding itself (the "bankruptcy-costs claim").

Citing 11 U.S.C. § 502(e)(1)(B), the bankruptcy court disallowed AAR's indemnification claim as a contingent claim for reimbursement—with our emphasis to highlight the point of contention—made by "an entity that *is liable with* the debtor."  The court next allowed AAR's defense-costs claim as a fixed, non-contingent claim outside § 502(e)(1)(B)'s ambit.  And finally, reading a negative implication into § 502(b)'s general allowance provision, the court

---

[1] AE HoldCo III, AE OpCo's parent, is also listed as an appellee/cross-appellant.  As AE OpCo was the debtor and AE HoldCo makes no distinct claims of its own, we'll refer to AE OpCo in the singular for the sake of convenience.

disallowed AAR's bankruptcy-costs claim as a post-petition unsecured claim for attorneys' fees.

Before us, AAR appeals the disallowed claims and AE OpCo, the allowed claim. With the benefit of extensive briefing and oral argument, we affirm the bankruptcy court's disallowance of the indemnification claim and its allowance of the defense-costs claim, but we reverse that court's disallowance of the bankruptcy-costs claim and remand for further proceedings consistent with this opinion.

## I

### A

This case arises out of a triangular arrangement that AE OpCo, AAR, and Short Brothers formed well before the bankruptcy. In 2009, AAR and Short Brothers executed an agreement that we'll call the "Procurement Contract." AAR's manufacturing subsidiary agreed to make airline parts for Short Brothers, and in return Short Brothers agreed to pay AAR's manufacturing sub a specified price. Importantly here, AAR agreed to guarantee its sub's performance in the event of default.

More than a decade later in 2020, Architect Equity, a private-equity fund that owns AE OpCo, saw some value in AAR's composite-materials operation—even after accounting for the by-then-unfavorable Procurement Contract. Architect arranged for AE OpCo to pay AAR $1.5 million for the business, which included AAR's $6 million manufacturing facility—but also its associated liabilities, including, as relevant here, the duty to perform on the Short Brothers

Procurement Contract.  Short Brothers was initially skeptical about swapping counterparties, as it had no experience working with Architect.  But once AE OpCo and AAR consummated their own deal, memorialized in what we'll call the "Asset Purchase Agreement," the three reached a compromise that exists at the center of this case.  In short, AAR reassured Short Brothers by agreeing to guarantee AE OpCo's performance on the Procurement Contract.  In return, AE OpCo agreed to indemnify AAR in the event that AE OpCo defaulted on its performance to Short Brothers.  Going forward, we'll call this aspect of the Asset Purchase Agreement the "Indemnification Agreement."  To the extent it's helpful, here's a visual demonstrative of the parties' relationship:

**Short Brothers**

Procurement Obligation

Guaranty of Performance

**AE OpCo**        Indemnification Agreement        **AAR**

Importantly, under this tripartite arrangement, both AE OpCo and AAR were potentially liable to Short Brothers: AE OpCo, directly, if it failed to perform its obligations under the Procurement Contract; and AAR, indirectly, through its guaranty of AE OpCo's performance.  The Indemnification Agreement between AE Opco and AAR contained several provisions relevant for our purposes:

- The operative provision: "[AE Opco] shall indemnify and hold harmless [AAR] . . . against and in respect of any and all <u>Losses</u> actually sustained, incurred or suffered by the Seller Parties, to the extent resulting or arising from" the Procurement Contract.  Asset Purchase Agreement § 8.2(b), Dkt. No. 408-2 (emphasis added).

- The definition of "Losses": "any and all losses, claims, damages, liabilities, fines, reasonable costs and expenses, including reasonable legal fees and expenses."  *Id.* § 8.2(a).

- A do-no-harm exception: "[T]he Indemnifying Party will have no liability in respect of any such Losses . . . if they would not have arisen but for any voluntary act, omission, transaction or arrangement carried out after Closing by the Indemnified Party . . . other than in the ordinary course of the Business as carried on at the Closing Date."  *Id.* § 8.5(c).

- A mitigation exception: "The parties shall take . . . all reasonable steps to mitigate any Loss upon becoming aware of any event that would reasonably be expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy a breach that gives rise to the Loss."  *Id.*

- A choice-of-law clause specifying that the contract would be governed by Delaware law. *Id.* § 9.11

**B**

In 2022, AE OpCo declared bankruptcy. Exercising one of its rights as debtor-in-possession, AE OpCo moved to "reject" (*i.e.*, get out of) the Procurement Contract with Short Brothers. Short Brothers and AAR thereafter submitted claims in bankruptcy for breach of contract and indemnification, respectively. While Short Brothers showed a willingness to engage in negotiations to avoid wholesale rejection, AAR sat out, professing a desire to "stay[] out of the way."

The AE OpCo–Short Brothers renegotiation bore fruit, in the form of what we'll call "the Settlement," which they submitted to the bankruptcy court and which it promptly approved. The Settlement, like the underlying Asset Purchase Agreement between AE OpCo and AAR, is governed by Delaware law. Pursuant to the Settlement, Short Brothers purchased the assets and inventory necessary to produce its own parts. AE OpCo's parent Architect also gave some consideration to both Short Brothers and the estate. More importantly for our purposes, Short Brothers substituted its proof of claim with a new one reflecting the insourcing costs and, more importantly still, executed a covenant not to sue AE OpCo. In relevant part, that covenant provided as follows:

> Subject to and from and after the Effective Date, each Protected Party hereby covenants not to bring any action of any nature against any other Protected Party

> before any legal, judicial, arbitration, administrative, executive, or other type of body or tribunal that has authority to adjudicate that action in whole or in part (an "Action") based on any claim arising out of the Procurement Contract or otherwise in existence as of the Effective Date . . . .

Mot. to Approve Compromise at 76.

Meanwhile, lawfare erupted in Northern Ireland, where Short Brothers, a UK-based company, sued AAR on its home turf. Citing AAR's guarantee of AE OpCo's performance, Short Brothers demanded that AAR pay it the more than $30 million that it had incurred following AE OpCo's rejection of the Procurement Contract. As relevant to our purposes, Short Brothers's Northern Ireland suit gave rise to an additional claim that AAR made in this bankruptcy: the defense-costs claim. So far as we're aware, the litigation in Northern Ireland remains ongoing.

The bankruptcy court ultimately considered three of AAR's claims before us on appeal: (1) the indemnification claim for the money that AAR is estimated to have to pay Short Brothers as part of its guaranty of AE OpCo's performance; (2) the defense-costs claim for certain incurred attorneys' fees and costs in the Northern Ireland litigation with Short Brothers; and (3) the bankruptcy-costs claim for the attorneys' fees and costs incurred in the bankruptcy proceeding. All three claims arise out of the Indemnification Agreement executed between AE OpCo and AAR.

With respect to those claims, the bankruptcy court ruled as follows:

1. It disallowed AAR's indemnification claim. The court reasoned that 11 U.S.C. § 502(e)(1)(B) required disallowance of this claim as a contingent "claim for reimbursement . . . of an entity that is liable with the debtor on . . . the claim of a creditor"—its point being that, by virtue of its guaranty of AE OpCo's performance, AAR was jointly liable with AE OpCo to Short Brothers.

2. It allowed AAR's defense-costs claim. The court held that the claim was not "contingent" under 11 U.S.C. § 502(e)(1)(B) because, at the time of disposition, the relevant legal fees had already been incurred and, therefore, that the claim was fixed in value.

3. It disallowed AAR's bankruptcy-costs claim. It interpreted 11 U.S.C. § 502(b)'s general requirement that the amount of an allowed claim be determined "as of the date of filing the petition" to require disallowance of all claims yet to be incurred at that time. Because a post-petition unsecured claim for attorneys' fees and costs is necessarily incurred only after the petition date, the court concluded, the claim had to be disallowed.

AAR now appeals the disallowances, and AE OpCo the allowance. Pursuant to 28 U.S.C. § 158(d), we granted the parties' request to appeal directly to this Court.[2]

## II

Before diving into the parties' complicated statutory arguments regarding the various claims' allowances and disallowances, we should set the table with a regulatory overview of sorts.

We'll start with the most basic point: For the most part, federal bankruptcy law doesn't create substantive rights. Instead, it provides a federal forum and process for administering rights that typically arise elsewhere, most often under state law. *See Butner v. United States*, 440 U.S. 48, 54 (1979). Those underlying substantive rights are preserved "[u]nless some federal interest requires a different result." *Butner*, 440 U.S. at 55. Here, as already noted, the rights and obligations under the Indemnification Agreement and the Settlement are governed by Delaware law.

When AE OpCo filed for bankruptcy and rejected the Procurement Contract, Short Brothers and AAR did what creditors do: They filed claims, seeking payment for breaches of rights they claimed under state law. Section 502 of the Bankruptcy Code supplies many of the rules that govern the "allowance" and "disallowance" of such claims. Under § 502, a properly filed claim is "deemed allowed" unless a party-in-interest objects. 11 U.S.C.

---

[2] We review a bankruptcy court's legal conclusions de novo. *In re Wagner*, 115 F.4th 1296, 1303 (11th Cir. 2024).

§ 502(a). If an objection is lodged, the court "shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount"—subject, importantly, to enumerated exceptions. *Id.* § 502(b).

The most relevant exception for present purposes isn't one of those catalogued in § 502(b) itself but, rather, one that is separately set forth in § 502(e)(1)(B). Given its significance here, that provision warrants verbatim recitation:

> Notwithstanding subsections (a) [and] (b) . . . the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . . (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

*Id.* § 502(e)(1)(B).

Accordingly, under § 502(e)(1)(B), a creditor's claim shall be disallowed if three conditions are met: (1) The claim is one for "reimbursement or contribution"; (2) it is made by or on behalf of an entity that "is liable with" the debtor on a claim of another creditor; and (3) it is "contingent as of the time of allowance or disallowance." *Id.* All agree that AAR's claims are for reimbursement or contribution, so condition (1) is satisfied. The parties dispute, though, whether, within the meaning of condition (2), AAR "is liable with" AE OpCo on Short Brothers's claim. They also dispute

whether AAR's defense-costs claim, in particular, was "contingent" at the pertinent time within the meaning of condition (3).

The parties separately dispute whether either § 502(b)'s requirement that the value of claims be determined "as of the date of the filing of the petition," or § 506(b)'s allowance of certain oversecured claims, requires disallowance of post-petition claims made by un- or undersecured creditors. We've already quoted § 502(b)'s language; here's § 506(b)'s:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

*Id.* § 506(b).

In the succeeding sections, we'll address each of AAR's claims in turn: the indemnification claim, the defense-costs claim, and the bankruptcy-costs claim.

## A

We start with the bankruptcy court's disallowance of AAR's indemnification claim. The parties vigorously dispute the temporal reach of § 502(e)(1)(B)'s second condition—namely, that the claim be brought by or on behalf of an entity that "is liable with"

the debtor. If co-liability is to be decided as of the time the bankruptcy petition is filed, then it seems clear enough that all three of § 502(e)(1)(B)'s conditions would be met and AAR's claim disallowed. That's because (1) AAR's claim is one for reimbursement, and (2) when AE OpCo filed for bankruptcy in 2022, AAR was indeed "liable with" AE OpCo on a claim of Short Brothers that (3) was contingent as of the time of allowance or disallowance. 11 U.S.C. § 502(e)(1)(B). Most importantly for present purposes, at that time, thanks to AAR's guaranty of AE OpCo's performance, both companies were liable to Short Brothers. So again, if the co-liability condition attaches on the petition date, AAR's indemnification claim is barred.

But—and it's potentially a big but—between the petition date and the claims hearing, AE OpCo and Short Brothers executed the Settlement. Contending that the Settlement released AE OpCo from any liability to Short Brothers, AAR asserts that it was then no longer "liable with" AE OpCo, that its claim therefore fails to meet § 502(e)(1)(B)'s second condition, and, therefore, that its claim should be allowed.

On the question whether co-liability should be measured as of the petition date or the date of the hearing, the parties engage in a statutory-interpretation battle royale. For its part, AAR stresses the words on the page: § 502(e)(1)(B) says "*is* liable," not "was liable," which means that the bankruptcy court should make the co-liability determination at the time it's deciding whether to allow or disallow claims, not on the earlier petition date. It also adds that

§ 502(e)(1)(B)'s purpose is to prevent double recovery, the risk of which essentially evaporates once the underlying claim is settled.

AE OpCo isn't without its own arguments, of course. The Code, it says, often fixes rights at the petition date—see, for instance, the definition of "creditor," 11 U.S.C. § 101(10), and § 502(b)'s reference to "the date of the filing of the petition," *id.* § 502(b). AE OpCo reasons that the petition date is a sensible default that Congress knows how to override when it wants to—as it did, for instance, with respect to § 502(e)(1)(B)'s contingency condition, which expressly refers to "the time of allowance or disallowance of such claim." *Id.* § 502(e)(1)(B). The fact that it didn't do the same for the co-liability provision, AE OpCo insists, must mean something. And as a matter of purpose and policy, it adds that bankruptcy's preference for compromise supports reading Code provisions to avoid a regime in which settlement opens the debtor's estate to additional exposure by converting previously disallowed claims into allowed ones.

Happily, we needn't delve too deeply into this knotty statutory dispute. The reason, which we'll explain, is that the Settlement didn't *release* AE OpCo from liability to Short Brothers; rather, the Settlement embodied mutual *covenants not to sue*. Delaware law, which governs our interpretation of the Settlement, recognizes and effectuates that formal distinction. The upshot is that even after the Settlement, AE OpCo *remained* liable to Short Brothers—and AAR thus *remained* co-liable with AE OpCo. So no matter when co-liability is measured—on the petition date or at the time

of the claims hearing—AAR's claim fails § 502(e)(1)(B)'s second condition and must be disallowed.  Let's unpack.

Under Delaware law, "[a] covenant not to sue and a release are different things." *New Enter. Assocs. 14 v. Rich*, 295 A.3d 520, 535 (Del. Ch. Ct. 2023).  In particular, "[a] covenant not to sue or execute is distinguished from a release as a forbearance of a right *rather than a discharge of liability*."  *Id.* (quoting 76 C.J.S. *Release* § 51, Westlaw) (emphasis added).  And that distinction matters.  Most notably here, a release results in the "cancellation of the claim" and "discharge of the released party."  *Id.* at 536; *see also, e.g., Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 392 (Del. 2015) (finding that a release "precluded a future claim for permanent impairment based on the same 'resolved' injury").  A covenant not to sue, by contrast, formally preserves the cause of action, even as the covenanting party agrees to a (potentially temporary) stand-down.  *See Rich*, 295 A.3d at 536 (observing that a covenant not to sue "is an executory contract that contemplates ongoing performance" and thereby leaves open the possibility of a later suit).

On its face, the AE OpCo–Short Brothers Settlement is undoubtedly a covenant not to sue, not a release.  Not only is it titled "Covenant Not to Sue," but its text is clear.  Again, it provides as follows:

> Subject to and from and after the Effective Date, each Protected Party hereby *covenants not to bring any action of any nature against any other Protected Party* before any legal, judicial, arbitration, administrative, execu-

tive, or other type of body or tribunal that has author-
ity to adjudicate that action in whole or in part (an
"Action") based on any claim arising out of the Pro-
curement Contract or otherwise in existence as of the
Effective Date . . . .

Mot. to Approve Compromise at 76 (emphasis added).

Applying Delaware law, as we must, we conclude that the
Settlement didn't release AE OpCo from its liability to Short Broth-
ers—meaning, again, that it formally remained on the hook, and
that AAR thus remained co-liable with it.

AAR advances several arguments against this conclusion,
but none is rooted in the governing Delaware law.  First, AAR
notes that in AE OpCo's pleadings and briefs, it has asserted that
the Settlement's covenant not to sue had the practical effect of ex-
tinguishing Short Brothers's claim against it.  Even if true, though,
that's beside the point.  To the extent that AAR means to argue that
AE OpCo has acceded to the Settlement's legal effect, "no
party . . . can stipulate to the law that governs its case through its
litigation conduct."  *United States v. Holland*, 117 F.4th 1352, 1360
(11th Cir. 2024).  And to the extent that AAR instead points to AE
OpCo's litigation statements as evidence of contractual meaning,
Delaware law privileges objective text over unilateral indications
of subjective intent—especially those expressed post-formation.
*See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229–30,
1230 n.144 (Del. 2018).

Second, AAR urges an analogy to Article III justiciability doctrine—specifically, how federal courts assess whether a once-live dispute has become moot.  Respectfully, we don't think the analogy holds up.  Mootness and liability ask different questions, and in different ways.  The former concerns the continued exist-ence of a live controversy; the latter concerns whether a legal obli-gation exists at all.  The former is practical; the latter is formal.  A Supreme Court decision that AAR invokes, *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), illustrates the distinction.  To be sure, that case addressed the effect of a covenant not to sue.  But again, it did so to a different end—namely, whether challenged conduct could "reasonably be expected to recur" and, thus, whether the case be-fore the Court was moot.  *Id*. at 91 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).  And in the circumstances presented, there was no reasonable expectation of recurrence.  By its terms, the covenant there was "unconditional and irrevocable."  *Id*. at 93.  And the Supreme Court has since reaf-firmed that this language—notably absent here—mattered to its reasonable-expectation-of-recurrence analysis.  *See Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 520 n.5 (2026) (emphasizing that the Article III injury alleged in *Already* was "a risk of being sued by a company that had issued an 'unconditional and irrevocable' cove-nant not to sue" (quoting *Already*, 568 U.S. at 93)).

More than that, the covenant at issue in *Already* barred more than just the filing of lawsuits; it broadly "prohibit[ed the would-be plaintiff] from making any claim *or* any demand."  *Already*, 568 U.S. at 93 (emphasis in original).  Indeed, the *Already* Court expressly

distinguished the covenant before it from the sort we have here, which operates, more narrowly, to preclude only the filing of any "action" before a legal body. *Compare* Mot. to Approve Compromise at 76, *with Already*, 568 U.S. at 93 ("Beyond simply prohibiting [the potential plaintiff] from filing suit . . . ."). The most a decision like *Already* can prove is that a sufficiently comprehensive covenant not to sue can extinguish the "reasonable expectation" or "demonstrated probability" that "the same controversy will recur" for mootness purposes, *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)—it can't convert a covenant into a formal release as a matter of state law.

Finally, AAR asserts that refusing to treat the Settlement's covenant not to sue like a formal release will "invite mischief," as it will enable debtors (like AE OpCo) to reach "discount settlements" with "underlying creditors" (like Short Brothers) while leaving "indemnitees [like itself] holding the bag." Reply Br. of Appellant at 22–23. Even if AAR's empirical premise were correct— Would an underfunded estate generate the same incentives for "discount settlements"?—the legal fact remains that the governing Delaware law recognizes the distinction that AAR resists. For good or ill, our hands are tied.

★  ★  ★

For all these reasons, we hold that under Delaware law, the covenant not to sue in the Settlement doesn't formally release AE OpCo or extinguish its liability to Short Brothers. Which means that regardless of how § 502(e)(1)(B) is best read—to measure a

claimant's co-liability at the time the petition is filed or on the date the claims hearing occurs—AAR was, at all relevant times, "liable with" AE OpCo to Short Brothers. Which, in turn, means that the bankruptcy court didn't err in disallowing AAR's indemnification claim.

**B**

Next up, the defense-costs claim. On this one, AE OpCo challenges the district court's *allowance* of AAR's claim for certain attorneys' fees and costs it has already incurred in defending itself against Short Brothers's action in Northern Ireland.

With respect to this claim, the parties dispute the meaning of § 502(e)(1)(B)'s third disallowance requirement—namely, that the claim for reimbursement be "contingent as of the time of allowance or disallowance." 11 U.S.C. § 502(e)(1)(B).[3] A contingent claim is one "that will become due upon the happening of a future event that was within the actual or presumed contemplation of the

---

[3] AAR separately disputes that the second, co-liability requirement is satisfied with respect to the defense-costs claim. Its challenge presents the question whether co-liability must be established for each claim or just one. Bankruptcy courts are split on the issue. *Compare In re RNI Wind Down Corp.*, 369 B.R. 174, 188–91 (Bankr. D. Del. 2007) (holding that defense costs cannot meet co-liability requirement), *with In re Fuel Barons, Inc.*, 488 B.R. 783, 788 (Bankr. N.D. Ga. 2013) (opting for a broader interpretation of co-liability that focuses on the underlying claim); *see also Fuel Barons*, 488 B.R. at 788 (detailing split). Because we conclude (for reasons explained in text) that the contingency prerequisite to disallowance isn't met, and because failure to satisfy any of § 502(e)(1)(B)'s prerequisites is a sufficient basis for refusing disallowance, we needn't decide the co-liability question.

parties at the time the original relationship between the parties was created." *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009) (internal quotations omitted); *see also United States v. Verdunn*, 89 F.3d 799, 801 & n.7 (11th Cir. 1996) ("[A] debt is noncontingent" at the time of petition "if all events giving rise to a debtor's liability occurred prior to the filing of the bankruptcy petition." (paraphrasing *In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995))). In other words, contingency turns on whether something that will give rise to the claim itself has yet to happen.

We hold that AAR's defense-costs claim is not "contingent" within the meaning of § 502(e)(1)(B). All events that would need to occur to determine the validity and value of the claim have already occurred. The Indemnification Agreement provides that AE OpCo "shall indemnify and hold harmless" AAR for "any and all Losses" that arise out of the Procurement Contract, and it defines "Losses" to include "reasonable legal fees and expenses." *See supra* at 5. AAR seeks reimbursement only for costs that it has *already* incurred. Nothing in the agreement turns on any future event.

AE OpCo, of course, insists that its obligation to reimburse AAR *is* contingent. It points to the Indemnification Agreement's two carveouts: (1) the do-no-harm exception that extinguishes liability for losses caused by AAR outside of the ordinary course of business; and (2) the mitigation exception that requires AAR to undertake reasonable efforts to limit losses. *See id*. The costs at issue

arise out of the underlying Short Brothers–AAR lawsuit in Northern Ireland, and, AE OpCo says, they are contingent on its outcome.

We disagree for several reasons. For starters, there's no language in the Indemnification Agreement that conditions AE OpCo's obligation to pay AAR's legal fees on AAR's success in the underlying suit. A favorable outcome would presumably make a legal bill easier to swallow, but the parties didn't peg the attorneys' fees to any particular disposition.

Moreover, the facts necessary to assess the extent of the Indemnification Agreement's carveouts are all in the rearview mirror. Indeed, in its briefing to us, AE OpCo itself observed that "the record is replete with evidence" bearing on the questions of good faith and mitigation, including (it says) AAR's (1) failure to participate in the settlement talks at the outset of bankruptcy and (2) refusal to render substitute performance on the Procurement Contract. Reply Br. of Appellant at 11. Notably, these are all *past* occurrences—not the kind of "future event[s]" that would establish contingency. *Ogle*, 586 F.3d at 146.

Finally, as we observed in *Verdunn*, the "overwhelming body of precedent" rejects the view that the mere existence of an ongoing legal dispute alone renders a claim "contingent" under the Bankruptcy Code. 89 F.3d at 802 n.9. That rejection reflects the basic distinction between a legal right and the procedural machinery used to enforce it. A contractual right sheds its contingency as the "relationship between the debtor and the creditor" evolves to

"contain[] all of the elements necessary to give rise to a legal obligation—a right to payment—under the relevant non-bankruptcy law." *Ogle*, 586 F.3d at 146 (internal quotations omitted). A judgment doesn't create that right but rather confirms and enforces it. *Cf. Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) (holding that agreeing to arbitrate claims entirely outside of court "does not alter or abridge substantive rights; it merely changes how those rights will be processed").

To the last point, AE OpCo responds that under Delaware indemnification law, AAR's pending judgment in Northern Ireland is more than a mere enforcement mechanism—it's one of those factual elements necessary to give rise to AAR's right to payment. This, it believes, follows from the "interdependence between the claimant's defense costs and the underlying action for indemnification." *In re Touch Am. Holdings, Inc.*, 409 B.R. 712, 719 (Bankr. D. Del. 2009) (citation modified); *see also, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 146 B.R. 92, 97 (S.D.N.Y. 1992). But the cases on which AE OpCo relies involved a very different kind of interdependence. In them, the claimants were the debtors' directors and officers, sued for alleged breaches of fiduciary duties to the debtor-corporations. The outcome of those cases would determine whether any right to indemnification existed in the first place. *See Touch Am.*, 409 B.R. at 716. In that posture, the underlying merits do bear on entitlement.

This case is different. The underlying Northern Ireland dispute doesn't ask whether AAR, as creditor, acted in good faith toward AE OpCo, as debtor. Rather, it concerns the validity and amount of AAR's reimbursement guaranty to *Short Brothers*. Whatever questions might exist about AAR's good faith or mitigation (or lack thereof) vis-à-vis AE OpCo are beside the point. The converse is also true: Resolution of the claims in Northern Ireland could hardly be deemed essential in clarifying whether AAR's liability for attorneys' fees is jeopardized by any potential past failure to act in good faith or mitigate.

⋆  ⋆  ⋆

To sum up, we agree with the bankruptcy court that AAR's claim for defense costs in its Northern Ireland litigation against Short Brothers is not contingent and therefore not disallowable under § 502(e)(1)(B).

## C

On, then, to AAR's bankruptcy-costs claim. AAR contends that the bankruptcy court erroneously relied on 11 U.S.C. § 502(b) to disallow its claim for post-petition attorneys' fees—to be clear, not the fees incurred in the Northern Ireland litigation but, rather, those incurred in the bankruptcy proceeding itself. AE OpCo counters that AAR's unsecured claim for post-petition attorneys' fees should be disallowed under either § 502(b), § 506(b), or both.

Unlike § 502(e)(1)(B), which expressly directs courts to *disallow* claims in specified circumstances, §§ 502(b) and 506(b) pre-

scribe rules for *allowing* claims.  Accordingly, we face a similar question under both provisions—namely, whether by providing for the allowance of certain claims under certain circumstances, they should be read to disallow claims in other circumstances.  So, for instance, by expressly instructing courts to determine allowable claim amounts on the petition date, does § 502(b) implicitly disallow claims for post-petition attorneys' fees whose amount is too speculative to be determined on the petition date?  And similarly, by allowing a secured claim for certain contractually guaranteed post-petition attorneys' fees when the creditor's underlying claim is oversecured, does § 506(b) implicitly disallow post-petition fees sought on an unsecured (or undersecured) claim?  Our sister circuits have refused to read a rule of disallowance-by-negative-implication into either provision, and in light of existing precedent, we likewise decline to do so.

In *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007), the Supreme Court considered the question whether an unsecured claim for post-petition attorneys' fees was subject to disallowance.  *Id.* at 446–47.  The argument for disallowance there, though, was narrower: that the Bankruptcy Code disallowed unsecured claims for post-petition attorneys' fees incurred litigating issues of bankruptcy law.  *Id.* at 445.  The Court rejected that argument, explaining that it found no support in § 502(b)'s nine enumerated exceptions.  *See id.* at 449–54.

Although the holding in *Travelers* doesn't control this case, its analysis is instructive.  The Court there emphasized that we

should be hesitant to disallow otherwise-valid claims absent clear textual cues. That circumspection flows directly from the *Butner* principle, which, as already explained, presumptively respects state-created interests. *Id.* at 450–51 (citing *Butner*, 440 U.S. at 55). In particular, courts should "generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are *expressly* disallowed" by federal statute. *Id.* at 452 (emphasis added). For our purposes, that means that AE OpCo needs to present clear "textual support" for its disallowance arguments. *Id.*

In fairness, the *Travelers* Court was careful to cabin its holding, observing that it wasn't addressing what its analysis might mean for *other* disallowance theories. The debtor there contended, for instance—not unlike AE OpCo has argued here—"that § 506(b) categorically disallows unsecured claims for contractual attorney's fees." *Id.* at 454. But because the debtor hadn't raised that argument below, the Court "express[ed] no opinion" about it—or, more generally, whether "other principles of bankruptcy law might provide an independent basis for disallowing [the creditor's] claim for attorney's fees." *Id.* at 456.

Even so, several of our sister circuits have taken *Travelers* to its logical conclusion and held that neither § 502(b) nor § 506(b) is properly read to require by negative inference the disallowance of certain claims. In *SummitBridge National Investments III, LLC v. Faison*, 915 F.3d 288 (4th Cir. 2019), and *Ogle v. Fidelity & Deposit Co. of Maryland*, 586 F.3d 143, 147 (2d Cir. 2009), the Fourth and Second Circuits, respectively, addressed arguments very similar to those

made by AE OpCo here.  Both held (1) that a fair reading of *Travelers* precludes any argument that § 502(b) categorically bars post-petition fees and (2) that any negative inference that might be read into § 506(b) isn't the sort of clear textual support necessary to override an otherwise-allowable post-petition claim. *Ogle*, 586 F.3d at 146–48; *SummitBridge*, 915 F.3d at 291–95.[4]

With respect to § 502(b), the Fourth Circuit observed that the *Travelers* Court moved directly from that provision's general rule of allowance to its nine enumerated exceptions, an exercise that would have been "wholly unnecessary" if, by virtue of their zero value on the petition date, the claims "could not constitute 'claims' at all" within the meaning of the rule. *SummitBridge*, 915 F.3d at 293.  The Second Circuit likewise concluded that because the *Travelers* Court didn't dispose the claim before it "on that simple, available ground," the Court's opinion "proceeds along lines that, reasonably extended, would suggest" that § 502(b) "does not bar recovery of post-petition attorneys' fees." *Ogle*, 586 F.3d at 147. We too agree that it would have made little sense for the Supreme

---

[4] The Seventh and Ninth Circuits have similarly allowed post-petition claims for attorneys' fees, albeit without explicitly considering the particular arguments that AE OpCo makes here.  *See In re Sokolik*, 635 F.3d 261, 267 (7th Cir. 2011) ("Finding no applicable exception in the Bankruptcy Code . . . we affirm the award of [post-petition, unsecured] costs and attorney's fees . . . ."); *In re SNTL Corp.*, 571 F.3d 826, 843–44 (9th Cir. 2009) (determining first that § 506(b) is "irrelevant to determining the allowability of an unsecured claim" and then that there's nothing explicit in the Bankruptcy Code that carves out yet-to-be-incurred fees from claim allowance).

Court to have analyzed § 502(b)'s exceptions if the sort of general prohibition that AE OpCo imagines existed.

With respect to § 506(b), the Fourth Circuit trained its focus on what *Travelers* said mattered most: clear text. Section 506(b), the Fourth Circuit explained, "never mentions, let alone expressly disallows, unsecured claims for post-petition attorneys' fees." *SummitBridge*, 915 F.3d at 294. The Second Circuit likewise emphasized that it was "decisive in *Travelers* that the Code says *nothing* about unsecured claims for contractual attorney's fees incurred while litigating issues of bankruptcy law," and "it is decisive here that § 506(b) says nothing about such fees incurred litigating things *other* than issues of bankruptcy law." *Ogle*, 586 F.3d at 148 (citation modified). We agree: Section 506(b) speaks exclusively in terms of what "shall be allowed" on top of "allowed secured claim[s]"; glaringly absent is any broad-sweeping bar on an entire class of otherwise-valid state-law claims. 11 U.S.C. § 506(b).

There's one more thing: We have already ruled on a related § 506(b) issue. True, our en banc opinion in *In re Welzel*, 275 F.3d 1308 (11th Cir. 2001), was a little different, and predated *Travelers* by several years. But in important respects our analysis anticipated the Supreme Court's own. There, we considered whether *unreasonable* pre-petition attorneys' fees are disallowable under § 506(b). The fees there, like those here, fell outside the scope of what § 506(b) allows as a secured claim. Accordingly, the debtor's argu-

ment there, like AE OpCo's here, necessarily depended on a negative inference—namely, that whatever isn't expressly allowed is impliedly disallowed. *See id.* at 1313–14.

In *Welzel*, we declined to draw that inference. We started with the need to harmonize § 502(b)'s general applicability to all claims with § 506(b)'s more specific instructions about certain fees and costs. *See id.* at 1316–17. The biggest difference between the two provisions, we said, was that unlike § 502(b), which has a general allowance provision followed by a list of enumerated disallowance exceptions, § 506(b) "is completely silent with regard to the allowance/disallowance issue." *Id.* at 1317. We then noted that § 506(b) deals, as its title indicates, with "[d]etermination of secured status." *Id.* Finally, we synthesized the two sections by holding that "Section 502 deals with the threshold question of whether a claim should be allowed or disallowed," and once that determination is made § 506 kicks in to "deal[] with the entirely different, more narrow question of whether certain types of claims should be considered secured or unsecured." *Id.* at 1318. The consequence: Falling outside § 506(b)'s reach resulted not in disallowance but in the mere denial of secured-claim status. *Id.*

*Welzel*'s reasoning reflects the same careful respect for the balance between federal interests and pre-existing state-law rights that animated *Travelers*. In *Welzel*, we declined to read a disallowance rule into § 506(b), which, on its face, doesn't bar claims. And along the way, we observed that § 502(b) generally allows a claim

"unless one of the exceptions enumerated in subsection (b) precludes allowance." *Id.* at 1316. So, very much like the Supreme Court in *Travelers* several years later, we failed to discern in either provision any general rule disallowing otherwise-valid post-petition claims for attorneys' fees.

We are unmoved by AE OpCo's proffered reasons for breaking from this line of persuasive authority. First, AE OpCo asserts that §§ 502 and 506 should be read together to "evidence a clear Congressional intent" to disallow all post-petition claims for attorneys' fees *except* for those made by oversecured creditors. Br. of Appellees at 52. That is so, AE OpCo says, because § 506(b) doesn't separately allow an unsecured claim to the extent that a creditor's claim is undersecured. But that, we think, gets things backwards. Section 502(b) provides in relevant part that the bankruptcy court "shall allow" all claims that don't meet its enumerated exceptions—and AE OpCo doesn't dispute that AAR's bankruptcy-costs claim is a "claim" for Bankruptcy Code purposes. Moreover, as already explained, *Travelers* cautions that when dealing with an otherwise-valid substantive entitlement, we shouldn't bar it absent a "clear[]" and "express[]" textual cue. 549 U.S. at 453. By suggesting that we should infer disallowance from § 506(b)'s failure to expressly *allow* unsecured claims for post-petition attorneys' fees, AE OpCo makes the very move that *Travelers* rejected—and does so at the expense of the usual respect we show for pre-bankruptcy contracts formed under state law.

Second, AE OpCo asserts that § 506(b)'s "shall be allowed" language should be read independently of § 502(b)'s "shall allow" command—otherwise, it says, we invite an absurd double allowance of claims. But we addressed and rejected that argument in *Welzel*. There, we explained that § 502 "deals with the threshold question of whether a claim should be allowed or disallowed." 275 F.3d at 1318. It's only after that threshold requirement is satisfied that § 506 comes into play, asking a different and narrower question: "whether certain types of claims should be considered secured or unsecured." *Id*. That division tracks the provisions' respective scopes. Section 502(b) "lays down general instructions" governing claims across the board. *Id*. at 1316. Section 506(b), by contrast, is triggered only when a creditor's collateral is worth more than the underlying claim. *Id*. at 1317. Properly understood, then, the provisions operate in sequence rather than in competition: Section 502 determines allowance; § 506(b) (where it applies) confers secured treatment to the extent that a claim is oversecured.

Finally, AE OpCo asserts that because the Supreme Court previously interpreted § 506(b) as disallowing undersecured creditors' claims for post-petition interest in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365 (1988), the same must go for attorneys' fees. But the distinction between interest and attorneys' fees matters. Section 502(b)(2) expressly disallows unmatured (*i.e.*, post-petition) interest. Accordingly, the baseline in *Timbers* wasn't that the interest claim would be allowed unless § 506(b) implicitly disallowed it. It was the opposite: The claim would be disallowed by § 502(b)(2), and the creditor could look to

§ 506(b) only for the allowance of interest alongside its principal claim. *See id.* at 372–73 ("[T]he undersecured creditor, who has no . . . cushion, falls within the general rule disallowing postpetition interest." (citing 11 U.S.C. § 502(b)(2))). We therefore agree with our sister circuits that "because § 502(b) does 'not contain a similar prohibition against [allowance of] attorneys' fees, the comparison between the current issue and that presented in *Timbers* is not persuasive.'" *SummitBridge*, 915 F.3d at 295 (quoting *SNTL*, 571 F.3d at 844); *see also Ogle*, 586 F.3d at 148 (same).

⋆   ⋆   ⋆

Bottom line:  Neither § 502(b) nor § 506(b) authorized the bankruptcy court to disallow AAR's bankruptcy-costs claim, and the court erred in doing so.

### III

So to recap, we **AFFIRM** the bankruptcy court's disallowance of the indemnification claim and its allowance of the defense-costs claim. But we **REVERSE** its disallowance of the bankruptcy-costs claim and **REMAND** for further action consistent with this opinion.